## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

UNITED STATES OF AMERICA    :
            :    CRIMINAL ACTION
v.            :    NO. 3:14-cr-00014-TCB-RGV
            :
MARGARET ROSSO, *et al.*,    :

## MAGISTRATE JUDGE'S FINAL REPORT,
## RECOMMENDATION, AND ORDER

Defendant Margaret Rosso ("Rosso"), is charged along with co-defendant Tony Hightower ("Hightower"), in an eighty-six count indictment with conspiracy and unlawful distribution of controlled substances through the Angel Pain Relief Center[1] located in Peachtree City, Georgia, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)C), (b)(1)(E), 846, and 856(a)(1) and 18 U.S.C. § 2. [Doc. 1]. Before the Court are Rosso's motions to dismiss the indictment due to inexcusable pre-indictment delay, [Doc. 28], to dismiss the indictment, or alternatively, to strike surplusage or preclude the jury from having access to the indictment, [Doc. 29], to suppress evidence illegally seized from her purse and her residence, [Docs. 30 & 31], and to suppress

---

[1] While the indictment refers to the Angel Pain Relief Center, see [Doc. 1], the parties and the search warrants at issue refer to the Atlanta Pain Relief Center, see [Docs. 30-1 & 31-1]. It appears that these entities are one and the same and will be referred to as the "Pain Center." See [Doc. 65 at 7]. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

statements, [Doc. 32], all of which the government opposes, [Doc. 40].  On January 26, 2015, Rosso filed replies in support of her motions, see [Docs. 45 & 46], and following an evidentiary hearing held on April 15, 2015, on her motion to suppress statements,[2] she filed additional replies in support of all of her motions, [Docs. 66, 67, & 80], and the government also filed its responses to Rosso's motion to suppress statements, [Docs. 75 & 85].[3]  For the reasons that follow, it is **RECOMMENDED**

_____

[2] See [Doc. 65] for the transcript of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at ___)."  The parties also submitted exhibits at the hearings, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Rosso's exhibit.

[3] On May 29, 2015, the government filed a motion for leave to file a sur-reply to Rosso's post-hearing briefs, [Doc. 74], and although "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies," USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), "the Court may in its discretion permit the filing of a surreply . . . where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief," Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1997 (N.D. Ga. 2005 ) (citations omitted).  The government seeks leave to file a sur-reply to address arguments raised by Rosso for the first time in her reply briefing.  See [Doc. 74].  Accordingly, the government's motion for leave to file a sur-reply, [Doc. 74], is **GRANTED**, and the Court will consider the sur-reply brief contained within the government's motion in ruling on Rosso's motions.  In addition, co-defendant Hightower filed several pretrial motions, see [Docs. 25, 27, 34, 70]; however, on August 7, 2015, he pled guilty, and his sentencing has been scheduled for October 23, 2015, see [Docs. 87 & 88].  Accordingly, Hightower's pretrial motions, [Docs. 25, 27, 34, 70], and the parties' consent motion associated with Hightower's motions, see [Doc. 84], are due to be **DENIED AS MOOT**.

that the pending motions, [Docs. 28, 29, 30, 31, & 32], be **DENIED**.

## I.  STATEMENT OF FACTS

**A.**      <u>The May 10, 2010, Search of the Pain Center Pursuant to a Search Warrant</u>

On May 7, 2010, Special Agent Anthony Byrd ("Agent Byrd"), who at the time

was an officer with the Peachtree City Police Department assigned to the Fayette

County Sheriff's Office Tactical Narcotics Team, applied for and received a search

warrant for the Pain Center located at 430 Prime Point, Suite 202, Peachtree City,

Georgia.[4] [Doc. 30-1].  In the affidavit in support of the application for the search

warrant, Agent Byrd recounted his employment history, and he then detailed an

investigation involving the Forsyth County Sheriff's Office, the Drugs and Narcotics

Agency, and the Georgia Composite Medical Board related to a complaint that John

Gatell, M.D. ("Dr. Gatell"), the owner of the Pain Center, was suspected of providing

fraudulent prescriptions for various controlled substances under the name of

Baubak Mansour, M.D. ("Dr. Mansour"), a physician practicing in Florida who had

provided a written statement that he had not authorized, nor had he prescribed, any

---

[4] Agent Byrd explained in his affidavit that the Pain Center was previously located at 315 Prime Point, Suite B, but had moved to 430 Prime Point, Suite 202. [Doc. 30-1 at 4].

3

prescriptions through Dr. Gatell's office since February 27, 2009, and that he had not worked in Georgia since that day.[5]  [Id. at 1-2].

Specifically, Agent Byrd detailed that he met with Investigator Terry Hawkins ("Inv. Hawkins"), of the Forsyth County Sheriff's Office; Special Agent Michael Karnbach ("Agent Karnback"), of the Drugs and Narcotics Agency; and Special Agent Stephanie Cleary ("Agent Cleary"), of the Georgia Composite Medical Board, on May 3, 2010, and that each of them provided him with information related to the investigation of Dr. Gatell and the Pain Center.  In particular, Agent Byrd relayed that Agent Cleary informed him that Dr. Gatell was placed on probation on December 3, 2004, "due to [] prescribing controlled substances such as Lortab, Valium, Percocet, Oxy[c]ontin and Dilaudid to certain patients[,] and [that] the tests conducted, a complete physical examination, and the treatment plans were not documented in the patient's medical records," among other things. [Id. at 2].  Agent Cleary explained that she had obtained 39 fraudulent prescriptions from varying counties throughout Georgia dated from March, 2009, to March, 2010, which bore Dr. Mansour's name and purported signature on Dr. Gatell's prescription pads. [Id.

---

[5] In the affidavit, Agent Byrd explained that on May 19, 2009, Rosso filed a report with the Peachtree City Police Department, in reference to a civil dispute that had occurred between the Pain Center and a patient. [Doc. 30-1 at 3]. According to Agent Byrd, the patient alleged that the Pain Center and Rosso had been "passing out Oxycodone, Methadone and Xanax[] prescriptions without the doctor being present and even though the Doctor [was] on probation." [Id.].

at 2-3]. She also described two visits to the Pain Center on February 1 and March 22, 2010, and reported that on both of those occasions, there was no doctor present in the clinic even though there were patients in the waiting room. [Id. at 3]. She recorded multiple tag numbers from vehicles parked in the business parking lot, and subsequently discovered that one of the vehicles, a 2007 Chevrolet Tahoe with a license plate titled, "LANLORD," was registered to Rosso, who was the office manager for the Pain Center. [Id.].

Agent Byrd also stated that Inv. Hawkins informed him that he had obtained a written statement from Dr. Mansour who said that he had not written prescriptions from the Pain Center since February 27, 2009, and that all other prescriptions bearing his name were fraudulent.[6] [Id.]. Inv. Hawkins reported that he had seized 120 fraudulent prescriptions written for 11 different patients from various pharmacies located in Forsyth County, bearing Dr. Mansour's name and purported signature on Dr. Gatell's prescription pads from February, 2009, to March, 2010. [Id.]. Agent Byrd also explained that Inv. Hawkins interviewed patient Wendy Ingram ("Ingram"), on April 30, 2010, subsequent to her presenting a "'Mansour'" prescription at a Forsyth County pharmacy related to an office visit

_____

[6] In addition, Agent Byrd relayed that Agent Karnbach also spoke with Dr. Mansour and confirmed that Dr. Mansour had not worked in the Pain Center since February 27, 2009. [Doc. 30-1 at 3].

at the Pain Center on March 18, 2010.  [Id.].  Ingram advised Inv. Hawkins that the Pain Center was "still seeing patients and [] giving out prescriptions," though they did not accept new patients, and that she had been going to the Pain Center since May or June of 2009 and had been given prescriptions every two months by "'Maggie.'"  [Id. at 4].[7]

Agent Byrd reported that he checked with the Fayette County Dispatch and Peachtree Police Department for any theft or loss reports from the Pain Center, but that no theft or loss reports had been filed in the past ten years and that there were no reports of any lost or stolen prescription pads by Rosso or the Pain Center.  [Id.].  Thereafter, on May 5, 2010, Agent Byrd surveilled the Pain Center and observed a white male entering the center and exiting with what appeared to be a small white piece of paper.  [Id.].  He also observed Ingram arrive at the Pain Center with a white female and a young child, and a check of Ingram's license revealed that it had been suspended.  [Id. at 4-5].  After observing Ingram leave the Pain Center, officers initiated a traffic stop of Ingram for driving on a suspended license.  [Id. at 5].  Ingram advised law enforcement that she went to the Pain Center to retrieve her medical record, and a review of her record indicated nothing from 2009 to 2010,

---

[7] Agent Byrd stated that copies of Ingram's prescriptions showed dates of December 16, 2009, and March 8, 2010, with Dr. Mansour's name and purported signature on Dr. Gatell's prescription pads.  [Doc. 30-1 at 4].

except policy changes and updates, as well as other personal information.  [Id.].

Ingram again reiterated that she visited the Pain Center every two months and

obtained prescriptions from "'Maggie'" from approximately May or June of 2009 to

March of 2010; however, no copies or records of those prescriptions were contained

in her medical record and some documents were not dated at all.  [Id.].  Agent Byrd

also described that a search incident to Ingram's arrest led to the discovery of an

empty prescription bottle dated April 19, 2010, from Dr. Gatell to Ingram for 30mg

Oxycodone pills, and that Ingram's passenger advised law enforcement that Ingram

was offered a prescription for a month's supply of pills for $70.00 while obtaining

her medical record, but that Ingram refused.  [Id.].

Based on these facts, a Fayette County State Court Judge signed the search

warrant and authorized law enforcement to search the entire premises and curtilage

located at 430 Prime Point, Suite 202, for the following:

> There is now located certain instruments, documents, articles, person(s)
> or things, namely: prescription pads with Dr. [] Mansour's name;
> forged or fraudulent prescription pads; forged documents with Dr. []
> Mansour's name, which are being possessed in violation of O.C.G.A.
> 16-13-41 and 16-9-1.    Additional items may include any
> pharmaceuticals and/or clandestine controlled substances, financial
> transaction papers, documents, currency, ledgers, address books,
> phone listings, notes of monies owed and earned, assets hidden in
> others' names, computers, media files, computer papers, patient's
> records, packaging material, scales and objects related to narcotic
> activity.  Any papers or records related to controlled substances such
> as books, prescription pads, prescription papers, receipts, ledgers,

papers, documentary business records, appointment books, medical records, medical treatment logs pertaining to administering or dispensing of controlled substances, patient appointment logs, invoices, shipping records, address books, bank statements and records, cell phone and landline phone records, customer records, credit card statements.  All the above records whether stored on paper or magnetic media such as tapes, cassette, disk, diskette, or on memory storage devices such as optical disks, programmable instruments such as telephones, electronic address books, calculators, or any other storage media, together with indication of use, ownership, possession or control of such records, connected with and/or possessed to facilitate the diversion of controlled substances.  Electronic data processing and storage devices, computers and computer systems, including central processing units; internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, or other temporary storage devices.  Which are in violation of O.C.G.A. 16-13-41 and 16-9-1.

[Id. at 6-8].[8]  On May 10, 2010, Agent Byrd, along with approximately ten other law enforcement officers, executed the search warrant at the Pain Center,[9] and Rosso was subsequently arrested and transported to the Fayette County Judicial Correction Services where she remained until she posted a bond.  (Tr. at 12-16, 42-44).

_____

[8] The State Court Judge noted an exception that patient medical records were not to be released outside of the investigating law enforcement agencies without permission from the court.  See [Doc. 30-1 at 8].

[9] During the search of the Pain Center pursuant to the search warrant, law enforcement officers also searched Rosso's purse.  See [Doc. 40 at 15-17; Docs. 30 & 67].  Additionally, Rosso made certain statements during the search, which she initially moved to suppress, see [Doc. 32].  However, the government, has agreed not to introduce those statements in its case-in-chief, see [Doc. 75 at 5 n.5]; (Tr. at 3-4, 43), though it does not concede that those statements were obtained in violation of Rosso's constitutional rights, see [Doc. 75 at 5 n.5].

8

**B.**   **The May 12, 2010, Search of Rosso's Residence Pursuant to a Search Warrant**

On May 12, 2010, Special Agent Sean DeJesus ("Agent DeJesus"), assigned to Fayette County Sheriff's Tactical Narcotics Team, applied for and obtained a search warrant for Rosso's residence located at 94 General Lee Drive, Newnan, Georgia. [Doc. 31-1].  After relaying his employment history, Agent DeJesus averred that he was investigating a complaint against the Pain Center that was "suspected of giving out fraudulent prescriptions using Dr. [] Mansour's name."  [Id. at 2].  He relayed information learned from Agent Byrd's meetings with Inv. Hawkins, Agent Karnback, and Agent Cleary,[10] [id. at 2-4], and he provided details about the execution of the search warrant at the Pain Center on May 10, 2010, [id. at 4].  In particular, Agent DeJesus relayed that after a "thorough search of the office[,] several articles and evidence of the [] suspected offenses were located," and that Rosso was "arrested for possessing forged prescriptions and other VGCSA violations."  [Id.].  He explained that agents "[l]ocated in the office [] various articles and documents in [Dr.] Gatell's name, including but not limited to a checkbook,

---

[10] In this respect, Agent DeJesus' averments in his affidavit are nearly identical to Agent Byrd's affidavit provided in support of the search warrant for the Pain Center.  Compare [Doc. 31-1], with [Doc. 30-1].  Therefore, the Court summarizes only those additional facts set forth in Agent DeJesus' affidavit that were not included in Agent Byrd's affidavit, or that occurred subsequent to the execution of the search warrant at the Pain Center.

articles of mail and diplomas." [Id.].  He also explained that checkbooks for a joint account under the names of Dr. Gatell and Rosso were "found during the business search and inside [] Rosso's purse." [Id.].

Agent DeJesus also described several statements attributed to Rosso during the search of the Pain Center, including that she stated she was "in charge of all finances for the office and was responsible for the collection of cash for the services rendered at the office," and that she took care of Dr. Gatell's personal finances and gave him "several thousands a week." [Id.].  Agent DeJesus also averred that the Pain Center "worked on a strictly cash basis as the sign in the waiting area stated: 'We can only accept cash at this time.  No checks No credit cards.'" [Id.].  Based on these facts, Agent DeJesus stated that he believed Rosso "knew that the prescriptions for narcotics were being illegally distributed" and that "further evidence of assets obtained through criminal means may be present at [Rosso's] residence." [Id.].  A Coweta County Superior Court Judge signed the warrant, authorizing the agents to search Rosso's residence for the following:

> Documents and evidence [] Rosso is actively involved with business matters pertaining to the physicians office currently located at Atlanta Pain Relief Center, 430 Prime Point, Suite 202, Peachtree City, Fayette County, Georgia.  As well as any and all records pertaining assets illegally and/or fraudulently obtained through the prescribing, administering, or dispensing of all controlled substances, and/or any pharmaceutical or clandestine controlled substances.  Additional items may include financial transaction papers, documents, currency,

ledgers, address books, phone listings, notes of monies owed and earned, and assets hidden in others' names, computers, laptops, media files, computer papers, electronic data, internet history files, image files, databases, spreadsheets, medical files, accounting files, any other type of computer file or data, patient's records, packaging material, scales and objects related to illegally obtained assets.

[Id. at 1, 5].  Agents executed the warrant on the same day.  See [Doc. 31 at 2].

## C.    The May 21, 2010, Interview of Rosso

On May 20, 2010, Rosso contacted Agent Byrd and advised him that she had an attorney but that he was on vacation, that she was willing to waive her Miranda rights,[11] and that she wanted to advise Agent Byrd about Dr. Gatell's ongoing activity, including that he was still promising patients prescriptions for medications in exchange for cash, but that these patients were leaving voicemails that they had sent money and had yet to receive their prescriptions, and that she believed Dr. Gatell was planning on leaving the country.  See (Gov. Ex. 1);[12] see also (Tr. at 48-49, 106).  Agent Byrd advised Rosso that he would not re-arrest her if she met with him and that she still retained her right to counsel and could refuse to answer any questions, and they agreed to meet the following day.  See (Tr. at 49-50; Gov. Ex. 1).

---

[11] See Miranda v. Arizona, 384 U.S. 436 (1966).

[12] Agent Byrd recorded this telephone call, though the recording is largely inaudible.  See (Gov. Ex. 1).

On May 21, 2010, Rosso met with Agent Byrd, Drug Enforcement Agency ("DEA") Investigator Tanya Tyson ("Inv. Tyson"), and two other DEA agents, in an interview room located in the Criminal Investigation Division at the Fayette County Sheriff's Office.  (Tr. at 39, 45, 50; Gov. Ex. 1; Def. Ex. 1); [Doc. 75-8 at 1].[13] Prior to Rosso making any statements, Agent Byrd, in the presence of Inv. Tyson and the other agents, advised Rosso of her <u>Miranda</u> rights.  [Doc. 75-8 at 2-4, 12]; (Gov. Ex. 1). Specifically, Agent Byrd advised Rosso that she had the right to remain silent and that any statements she made could be used against her.  [Doc. 75-8 at 3]; (Gov. Exs. 1 & 3).  He further advised Rosso that she had the right to speak to an attorney, to have one present during the questioning, to have one appointed for her if she could not afford one, and, in the event she proceeded with questioning without an attorney, to stop answering questions at any time.  [Doc. 75-8 at 3]; (Gov. Exs. 1 & 3).  Agent Byrd asked Rosso whether she understood her rights, and she responded, "Yes sir."  [Doc. 75-8 at 4]; (Gov. Exs. 1 & 3).  She also placed her initials

---

[13] The May 21 meeting was video recorded in its entirety.  <u>See</u> (Tr. at 50; Gov. Ex. 1).  Additionally, the government transcribed the recording, <u>see</u> [Doc. 75-8], and although Rosso has reserved her right to challenge the accuracy of the transcript prior to its use at trial or any subsequent hearing, <u>see</u> [Doc. 80 at 4], both parties refer to the transcript in addressing Rosso's motion to suppress her statements.  Thus, the Court will refer to both the video recording and the transcript of the recording in this Report and Recommendation.

beside each question on the pre-printed <u>Miranda</u> form and she then signed the
waiver of rights portion, which states:

> I have read this statement of my rights and I understand what my
> rights are.  I am willing to make a statement and answer questions.  I
> do not want a lawyer at this time.  I understand and know what I am
> doing.  No promises or threats have been made to me and no pressure
> or coercion of any kind has been used against me.

[Doc. 75-8 at 3-4, 12]; (Gov. Exs. 1 & 3).  After advising Rosso of her rights, Agent
Byrd asked her what she could tell them about Dr. Gatell, and in response, Rosso
clarified that she had an attorney and that he had asked her "not to elaborate too
expansively or anything," but that "apparently you think it's all me.  I didn't know
I was doing anything wrong.  I didn't know I had done anything.  I had wanted to
quit over and over and over and over again."  [Doc. 75-8 at 4-5]; (Gov. Ex. 1).  Rosso
then stated that her current concern and "what [she] wanted to bring to [the agents']
attention . . . [was] that [Dr. Gatell] was calling all of the patients [] and telling them
that . . . the office is closed, but if they can get him some money, he can go ahead and
mail them the prescriptions" and that she had recorded voicemails of patients
suggesting that they had sent the money but never received the prescriptions.  [Doc.
75-8 at 6]; (Gov. Ex. 1).[14]

---

[14] Inv. Tyson prepared a Report of Investigation on May 21, 2010, related to
this interview of Rosso, in which she noted that Rosso was advised of her legal
rights, that she waived her rights, and that she agreed to "answer questions
pertaining to anything except her participation in the investigation."  (Tr. at 107-08;

Rosso continued to make statements on a variety of subjects related to Dr. Gatell and her role in the Pain Center, among other topics, <u>see generally</u> [Doc. 75-8]; (Gov. Ex. 1), and she asserted that three other pain management doctors were committing insurance fraud and a fourth had "killed one of [her] patients," but when Agent Byrd asked for their names, she responded, "No not till my charges are gone. . . . At that point [] [my attorney] I want him to help with that.  And I will go ahead and tell you about anyone of those doctors, every detail.  I will go in there and tape record them.  I don't care."  [Doc. 75-8 at 13-14]; (Gov Ex. 1).  At this point, Inv. Tyson said, "Okay.  Well, let's get back to Dr. Gatell," [Doc. 75-8 at 14], and Rosso again made statements regarding Dr. Gatell, Dr. Mansour, the Pain Center, her conversations with Dr. Gatell's attorney, and how she came to be an employee of the Pain Center, among other things, <u>see</u> [<u>id.</u> at 14-62].  At one point, Rosso again reiterated that she "thought [she] was doing everything right.  [She] thought [she] was doing everything by the book.  [She] had no unearthly idea, but [she knew] a lot of things about several . . . doctors, and [she knew] a lot of things about what [Dr. Gatell] did.  [She knew] a lot more details.  [She knew] a lot more things."  [<u>Id.</u> at 63].  Inv. Tyson responded that "what we're interest in is what [Dr. Gatell] did," and that "we're not going to enter into agreement with you what so ever."  [<u>Id.</u>]; <u>see also</u> [<u>id.</u>

Def. Ex. 1).

14

at 33 (Inv. Tyson asking Rosso to give him the "full details of how you went from being an employee to where you are now with – with the concentration on Dr. Gatell, okay"), 65 (Agent Frances advising Rosso that as far as her charges go, "that's something that'll have to be talked about in the future," but that "[a]t this point we're looking at Dr. Gatell")].

Rosso proceeded to make further statements about Dr. Gatell, the finances of the Pain Center, and her co-defendant Hightower, [id. at 66-99], and then she mentioned needing to go home and the agents advised her that they were not going to keep her, but Rosso continued to make statements, including that she would "do anything" and that she "didn't know [she] was doing anything wrong," [id. at 99-101]. After Rosso continued to speak, Inv. Tyson said, "Well, you . . . need to go on," but Rosso continued to give further statements regarding Dr. Gatell, including telling the agents that her goal for that day was to inform them that Dr. Gatell was soliciting his patients for money in exchange for prescriptions that they were never going to receive. [Id. at 101-03]. Agent Byrd then advised Rosso that she was free to go, "but what we do then we probably will sit down again with you and your attorney you know whenever I guess he comes back from vacation," [id. at 103], and then Agent Byrd asked Rosso one "last question" about who signed the prescriptions and Rosso responded, "I think that's something [my attorney] should

answer," [id.].  Agent Byrd then said, "what we do is that then like I said we–whenever he comes back from vacation, you've got my phone number," [id.], but Rosso made a few more statements in relation to two patients, [id. at 104-05], during which Agent Byrd interrupted her and said, "you said you want to go home, I actually don't want to keep you here," [id. at 106].  Rosso stated that she did need to use the restroom, and Agent Byrd concluded the interview and stated, "I'm sure you have a lot of stuff to do.  Like I said we'll keep in touch.  You've got my phone number.  You got some question or whatever, you shoot me a call [whenever your attorney] comes back."  [Id.].  The interview lasted approximately one hour and forty-five minutes, (Gov. Ex. 1); see also (Tr. at 51), and Rosso left on her own accord, (Gov. Ex. 1).

## D.   **The August 12, 2014, Criminal Indictment**

On August 12, 2014, a grand jury in this district returned an indictment against Rosso and Hightower, charging them with knowingly and willfully conspiring, and having a tacit understanding with each other and others known and unknown, to knowingly and intentionally distribute and dispense, without a prescription written or authorized by a medical practitioner authorized to prescribe controlled substances, mixtures and substances containing detectable amounts of various controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c), and

16

(b)(1)(E). [Doc. 1]. In addition, Rosso is charged with one count of knowingly and intentionally opening, leasing, renting, using, and maintaining a place, namely the Pain Center, for the purpose of distributing controlled substances without a prescription that was written or authorized by a medical practitioner authorized to prescribe controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(E), and 856(a)(1), and with fifty-three counts of knowingly and intentionally distributing and dispensing, and aiding and abetting the distribution and dispensing of, tablets, pills, and syrups, which were mixtures and substances containing various controlled substances, by issuing and causing to be issued orders purporting to be prescriptions that were neither written nor authorized by a medical practitioner authorized to prescribe controlled substances, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and (b)(1)(E), and Rosso and Hightower are charged together with an additional thirty-one counts of the same. [Id.].

The indictment includes an "Introduction," which sets forth information related to the Controlled Substances Act ("CSA"), and its implementing regulations, and providing descriptions of the controlled substances at issue. [Id. at 1-4 ¶¶ 1-7]. According to the indictment, Rosso, who was described as the office manager for the Pain Center, "would and did knowingly use, operate, and maintain the Pain Center for the purpose of unlawfully distributing and causing the unlawful distribution of

controlled substances, including Oxycodone (Schedule II), Hydromorphone (Schedule II), Hydrocodone (Schedules II and III), Morphine Sulfate (Schedule II), Methadone (Schedule II), and Fentanyl (Schedule II)." [Id. at 4 ¶ 8, 6 ¶ 13]. The indictment further alleges that Rosso and Hightower "would and did knowingly and intentionally distribute and cause, aid, abet, and facilitate the distribution of controlled substances at the Pain Center, without a prescription that was written or authorized by a medical practitioner authorized to prescribe controlled substances," [id. at 6 ¶ 14], that they "would and did require a customer to pay between $200 and $500 each time the customer visited the Pain Center for an order purporting to be a prescription for controlled substances, allegedly as fees for the 'office visit,'" [id. at 6-7 ¶ 15], and that they "would and did issue orders purporting to be prescriptions for controlled substances by using, and causing to be used, without lawful authority, the name and purported signatures of a medical practitioner authorized to prescribe controlled substances," [id. at 7 ¶ 16]. Rosso is further alleged to have "signed the name of a medical practitioner authorized to prescribe controlled substances on orders purporting to be prescriptions for controlled substances and handed them out to customers in exchange for cash payments, many of whom had not been seen in person by a physician for several months," [id. at 7 ¶ 17], and that she, and others, "collected significant amounts of cash generated from the business at the Pain

18

Center on a daily basis, and routinely made large cash deposits at one or more banks in the Atlanta area," [id. at 7 ¶ 19].

Rosso has filed several pretrial motions in relation to the search warrants executed at the Pain Center and her residence, her statements made on May 21, 2010, and the allegations contained in the instant indictment, see [Docs. 28, 29, 30, 31, & 32], and after having been fully briefed, see [Docs. 40, 45, 46, 66, 67, 74, 75, 80, & 85], the pending motions are now ripe for ruling.

## II. DISCUSSION

### A.   Motion to Dismiss the Indictment Due to Inexcusable Pre-Indictment Delay, [Doc. 28]

Rosso moves to dismiss the August 12, 2014, indictment due to the alleged inexcusable delay of "four years, 3 months, and two days after being arrested," arguing that her due process rights were violated, that she has suffered actual prejudice due to the death of attorney Leroy Toliver ("Toliver"), who she claims was Dr. Gatell's attorney and would have been one of her witnesses, and that the delay "places the government at a distinct advantage over [her]." [Doc. 28 at 3, 5]. Rosso also asserts that she has been prejudiced since evidence has been lost, Agent Byrd "apparently has no independent recollection of the pertinent facts of this case to such an extent that he could not authenticate witness statements he obtained from co-defendant Hightower," [Doc. 66 at 5 (footnote omitted)], and that many of the

recording devices used during the interviews "are of such poor quality so as to render them useless to this Court or at any trial," [id.].  Rosso also "asks for an opportunity to confer with this Court *in camera* and *ex parte* so as to be able to make a record as to how undersigned counsel now find themselves prejudiced in their ability to effectively represent [Rosso] because of the delay in the returning of the indictment in this case."  [Doc. 28 at 6].

In response, the government asserts that the indictment was brought within the applicable five-year statute of limitations,[15] and that Rosso's arguments are without merit because she has failed to allege that any pre-indictment delay was the result of bad faith or deliberate action by the government.  [Doc. 40 at 4-12; Doc. 74 at 5].  The government also asserts that Rosso mischaracterizes Agent Byrd's testimony, that the audio recordings are clearly audible,[16] and that she has simply failed to show that she has suffered prejudice.  [Doc. 74 at 6-8].  Finally, the government maintains that "there is no reason for the court to dismiss the

_____

[15] The government also points out that Toliver passed away in February, 2011, which it contends was "only five months and ten days after counsel first brought him to the government's attention" in August, 2010, and that "[a]ny time that elapsed after the witness's passing is irrelevant."  [Doc. 40 at 5-6]; see also [Doc. 28 at 3 (noting Toliver died on February 5, 2011, and not February 5, 2010, as the government mistakenly stated in its brief)].

[16] The government concedes that the "worst quality recordings are those from the search warrant," and it has agreed not to use those recordings in its case in chief against Rosso.  [Doc. 74 at 7 n.3].

indictment," and the Court need not "resort to the other remedies that [Rosso] proffers." [Doc. 40 at 11].

The general statute of limitations for non-capital federal offenses such as those charged in the present indictment is five years. See 18 U.S.C. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed."). "The statute of limitations is the primary safeguard against the government bringing stale criminal charges, but when a defendant establishes substantial prejudice, due process may require the dismissal of an otherwise timely indictment if the delay was the product of a deliberate act by the government to gain a tactical advantage." United States v. Ramirez, 491 F. App'x 65, 70 (11th Cir. 2012) (per curiam) (unpublished) (internal citations omitted). That is, to prevail on a due process violation claim, Rosso must show that "pre-indictment delay (1) caused actual prejudice to the conduct of [her] defense, *and* (2) was the product of deliberate action by the government designed to gain a tactical advantage." United States v. Jones, 592 F. App'x 920, 921 (11th Cir. 2015) (per curiam) (unpublished) (emphasis added) (citation omitted).[17] "Because

_____

[17] "[T]he law in this circuit is that prejudice will not be presumed because of a lengthy delay," United States v. Williams, Criminal Case Nos. 1:11–CR–547–ODE–ECS, 1:12–CR–80–ODE–ECS, 2012 WL 5845004, at *1 (N.D. Ga. Nov. 16, 2012) (citations and internal marks omitted), and, with respect to the second

[Rosso] does not argue that the applicable statute[] of limitations barred [her] prosecution, [s]he shoulders the burden of show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage." Ramirez, 491 F. App'x at 70 (last alteration in original) (citation and internal marks omitted). "The burden of satisfying the 'tactical advantage' test rests with [Rosso], and that burden has been characterized as a 'heavy' one."[18] United States v. Stoll, No. 10–60194–CR, 2011 WL 939251, at *7 (S.D. Fla. Feb. 16, 2011), adopted by 2011 WL 765949, at *1 (S.D. Fla. Feb. 25, 2011) (citation omitted). "Indeed, so 'rare' are dismissals for pre-indictment delay that [the Eleventh Circuit] remarked that it had 'never concluded that such a dismissal was appropriate.'" Id. (quoting United States v. Foxman, 87 F.3d 1220, 1224 n.4 (11th Cir. 1996)).[19]

---

prong, "simply gaining a tactical advantage is not enough" as the "tactical advantage must be the result of deliberate action by the government toward that end," Jones, 592 F. App'x at 922 (citation omitted). "Both prongs of [the] test must be satisfied to make relief available to a defendant[.]" United States v. Hawes, No. 5:14–CR–397–RDP–TMP, 2015 WL 4067331, at *2 (N.D. Ala. July 1, 2015) (citation omitted).

[18] Moreover, "the Eleventh Circuit . . . determined that addressing the prejudice prong was not necessary if the defendant failed to carry [her] burden with respect to the deliberate-delay prong." United States v. Baez-Hernandez, No. 8:14–CR–64–T–17TGW, 2014 WL 2612066, at *2 (M.D. Fla. June 11, 2014) (citation omitted).

[19] Although the Court finds that Rosso has failed to meet the second prong of the analysis, and therefore need not address Rosso's arguments with regard to prejudice, the Court will nevertheless briefly discuss all of her arguments.

Rosso "must demonstrate *actual* prejudice and not merely the real possibility of prejudice inherent in any extended delay." United States v. Heard, No. 1:12–cr–40 (WLS), 2013 WL 1966299, at *3 (M.D. Ga. May 10, 2013) (citations and internal marks omitted). Rosso asserts that the death of Toliver, whom she contends was involved in running the Pain Center and provided her with legal advice upon which she relied, demonstrates that she has suffered actual prejudice from the pre-indictment delay in this case. See [Doc. 28 at 2-3]. She contends that Toliver was the witness who could exculpate her, but that the "government's unnecessary delay in bringing the indictment . . . now precludes the calling of . . . Toliver as a witness on behalf of [d]efendant," and that it also "now necessarily prevents the government from interviewing him and from being provided with evidence that would exonerate [her] or, evidence that, at the very least, would be required to be turned over to [her] as exculpatory *Brady* material." [Id. at 4]. Rosso also maintains that she has suffered prejudice as a result of her belief that unspecified evidence has been lost, Agent Byrd's lack of an independent recollection of the case, and the poor quality of the audio recordings made during the course of the investigation in this case. See [Doc. 66].

"To prove prejudice from the loss of deceased witnesses' testimony, [] a defendant must make more than a general allegation of loss of witnesses."

<u>Williams</u>, 2012 WL 5845004, at *2 (citations and internal marks omitted); <u>see also</u> <u>Heard</u>, 2013 WL 1966299, at *3 (second alteration in original) (citation and internal marks omitted) ("[S]peculative allegations, such as general allegation of loss of witnesses and failure of memories, are insufficient to demonstrate . . . actual prejudice[.]").  While Rosso relies solely on her own belief that Toliver would have testified that he advised her that her alleged actions of dispensing controlled substances without the presence of an authorized physician was legal and that he advised her on the daily operations of the Pain Center, <u>see</u> [Doc. 28 at 2], "[n]o other evidence exists to corroborate this contention," <u>United States v. Jones</u>, No. 4:12–CR–6 (CDL), 2013 WL 6794978, at *2 (M.D. Ga. Dec. 19, 2013), and "[c]oncrete proof is required for [Rosso] to carry [her] heavy burden," <u>United States v. Campbell</u>, No. 1:04–CR–0424–RWS, 2005 WL 6436621, at *16 (N.D. Ga. Oct. 24, 2005) (citation omitted).  Rosso has not sufficiently shown that Toliver's death "impaired [her] ability to prove a meaningful defense" since she "has adduced no evidence suggesting that [Toliver] would have testified on [her] behalf," and in fact, based on Rosso's assertion that Toliver was involved in running the Pain Center, where the alleged unlawful distribution of controlled substances occurred, "it is doubtful that he would have risked incriminating himself by testifying." <u>United States v.</u> <u>Randolph</u>, Criminal Action File No. 4:11–CR–17–RLV–WEJ, 2011 WL 5921455, at *4

24

(N.D. Ga. Nov. 2, 2011), adopted by 2011 WL 5925588, at *1 (N.D. Ga. Nov. 21, 2011) (citation and internal marks omitted).

Although Rosso asserts that she "does not believe that law enforcement ever attempted to speak with . . . Toliver about [Rosso's] involvement in this case," and that she offered to make monitored telephone calls to Toliver to assist the government in obtaining evidence, see [Doc. 28 at 3], the record shows that an Assistant United States Attorney actually contacted Toliver's counsel in July, 2010, and it was determined at that time that there may be an issue with attorney client privilege and that they needed to speak with Rosso's current counsel regarding waiving any such privilege so they could speak with Toliver about Rosso's involvement. See [Doc. 40-1 at 1]. More importantly, as the government points out, Toliver died on February 5, 2011, a little more than five months after defense counsel assets he first informed the government of Toliver's alleged involvement, see [Doc. 40 at 5-6]; see also [Doc. 28 at 2 (defense counsel noting that he first advised the government of Toliver's existence on August 26, 2010)], and only nine months following Rosso's arrest of May 10, 2010. "Consequently, for any prejudice to be attributed to the loss of [Toliver] as a witness, the Court would have to find that the Constitution required that the case be indicted and tried within [nine] months of the

25

offense date," Jones, 2013 WL 6794978, at *2 n.3, which is simply not the case.[20]

Thus, the Court finds that the alleged prejudice in this case fails to "rise to

constitutional proportions [necessary] to support dismissal."  United States v. Keel,

---

[20] Rosso's remaining arguments with respect to prejudice may be summarily
rejected.  First, Rosso's vague argument related to the possible loss of unspecified
evidence, see [Doc. 66 at 5], appears to be based on pure speculation, and the "mere
possibility of prejudice . . . is not sufficient to establish a due process violation, and
the[se] general claims of prejudice . . . are insufficient to satisfy [Rosso's]
'exceedingly high' burden of showing actual prejudice resulting from the delay,"
United States v. Jones, No. CR406-38, 2006 WL 1653762, at *2 (S.D. Ga. June 7, 2006),
adopted at *1.  Additionally, although Rosso argues that Agent Byrd's faded
memories of this case during the evidentiary hearing demonstrates actual prejudice,
she mischaracterizes the record.  Indeed, while Agent Byrd may not have recalled
every aspect of the case, he was able to testify about the investigation and provide
an independent recollection as to specific details that occurred, see generally (Tr. at
1-84), and in any event, "[f]aded memories occasioned by pre-indictment delay do
not alone satisfy the actual prejudice requirement," Williams, 2012 WL 5845004, at
*2 (citations omitted).  Moreover, Rosso's argument related to the poor audio
recordings is completely without merit as the Court reviewed the recording of
Rosso's May 21, 2010, interview, which is clearly audible, see (Gov. Ex. 1), and the
government has agreed not to introduce in its case-in-chief the audio recordings
from the search warrant executions, see [Doc. 74 at 7 n.3].  Finally, Rosso's
speculation that Agent Byrd's memory issues somehow "raises serious concerns
regarding the memories of the government's other potential witnesses," [Doc. 66 at
5 (citation omitted)], is exactly the type of bare allegation that has been found to be
insufficient to satisfy the heavy burden of proving actual prejudice, see Campbell,
2005 WL 6436621, at *3 (citations omitted); see also United States v. Rice, 550 F.2d
1364, 1369 (5th Cir. 1977) (affirming denial of evidentiary hearing on alleged pre-
indictment delay where there was a lack of supporting evidence).  Decisions of the
Fifth Circuit rendered before October 1, 1981, are binding precedent of the Eleventh
Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc).

254 F. App'x 759, 760 (11th Cir. 2007) (per curiam) (unpublished) (internal marks omitted) (quoting United States v. Benson, 846 F.2d 1338, 1342 (11th Cir. 1988)).

Furthermore, "substantial prejudice from delay, standing alone, does not violate due process." Williams, 2012 WL 5845004, at *2 (alteration omitted) (citation and internal marks omitted). That is, "[e]ven if [Rosso could] make the necessary showing of prejudice from the delay, [t]he delay must also be the product of a deliberate act by the government designed to gain a tactical advantage," and "[m]any delays in obtaining an indictment would not be tactical– a word which [the Eleventh Circuit has interpreted as] inherently includ[ing] the concept of intentionally maneuvering for an advantage at trial." Id. (third alteration in original) (citations and internal marks omitted). "[W]here the record shows no reason for the delay (or where delay is due to simple negligence), no due process violation exists." Id. (citation and internal marks omitted).

Rosso asserts that the government deliberately delayed bringing the instant indictment to gain a tactical advantage, arguing that the delay afforded the government time "to leisurely investigate this case over a four year period of time; . . . to interview former patients of the [Pain Center] and other witnesses in this case; . . . to issue DEA administrative subpoenas and/or grand jury subpoenas for the purpose of obtaining records to be utilized against [her]; . . . to assemble, correlate

27

and digest these records . . .; and . . . [to] prepar[e] for a trial in this case." [Doc. 28 at 5]. Rosso also maintains that "[a]ll investigative work appears to have taken place prior to [her] arrest or in the weeks shortly thereafter," [Doc. 66 at 2], and that "requiring her to present evidence of intentional delay by the government, without the opportunity to subpoena witnesses and present testimony at an evidentiary hearing, sets a nearly impossible threshold for an defendant to meet at this stage," [id. at 3]. Thus, she contends that although she has the burden to establish deliberate action by the government, "given the government's unexplained and inexcusable over four year delay in indicting the case, [she] has sufficiently established that her due process claim is not specious and warrants an evidentiary hearing." [Id.].

In support of her argument that her due process claim warrants an evidentiary hearing, Rosso relies on United States v. Sabath, 990 F. Supp. 1007 (N.D. Ill. 1998), in which a district court, applying a "recklessness" standard, determined that bad faith may be presumed in the absence of any legitimate investigatory reason for a pre-indictment delay. Id. at 1017-18. However, Rosso's reliance on this case is misplaced since the "recklessness" test "has not been adopted– but rejected– by the Eleventh Circuit." Stoll, 2011 WL 939251, at *12. In fact, the Sabath court even noted the circuit split and acknowledged that the Eleventh Circuit, along with

28

the First, Second, Third, Sixth, Tenth, and D.C. Circuits, "demand a showing that the government acted in bad faith or intentionally delayed the indictment to gain tactical advantage," and that a pre-indictment delay "can never violate due process without a showing of bad faith." 990 F. Supp. at 1017. Thus, although Rosso urges the Court to adopt the less stringent "recklessness" standard recited in Sabath, the Eleventh Circuit recently confirmed that a defendant must demonstrate that the delay was the product of deliberate action by the government, see Jones, 592 F. App'x at 922, and this circuit precedent is dispositive.

Rosso has "not alleged that the government deliberately sought a tactical advantage by delaying the indictment," but instead, has simply shown, at most, that "the delay– combined with [some] prejudice to [her] . . . gave the government a tactical advantage"; however, "simply gaining a tactical advantage is not enough." Id. (citation omitted). Indeed, even if Rosso's "assertion that the delay has given the [g]overnment a tactical advantage" is true, it "does not satisfy her duty to show that the [g]overnment deliberately delayed the indictment to gain a tactical advantage."[21]

---

[21] In fact, Rosso's argument that the delay gave the government a tactical advantage of time to investigate the case and to prepare for trial, see [Doc. 28 at 5], is completely without merit as a "prosecutor need not seek an indictment until he is satisfied that he can prove guilt beyond a reasonable doubt," United States v. Solomon, 686 F.2d 863, 872 (11th Cir. 1982) (citation omitted). Moreover, as the government points out, see [Doc. 40 at 5], it appears that defense counsel has been involved in this case at least since August, 2010, see [Doc. 28 at 2 (noting that counsel was retained after Rosso was released on bond and contacted the U.S. Attorney's

<u>United States v. Rivera</u>, No. CR209–14, 2009 WL 2390847, at *2 (S.D. Ga. July 9, 2009), adopted by 2009 WL 2422211, at *1 (S.D. Ga. Aug. 4, 2009); <u>see also</u> <u>United States v. Lamb</u>, 214 F. App'x 908, 912 (11th Cir. 2007) (per curiam) (unpublished). "Furthermore, the [g]overnment does not have the burden of coming forward with a reason for the delay," <u>United States v. Pompano Helicopters, Inc.</u>, No. 08-60279-CR, 2009 WL 1456745, at *4 (S.D. Fla. May 22, 2009), adopted at *1 (citation omitted), and while Rosso asserts that nothing in discovery "indicates any justification whatsoever on the part of the government in delaying the bringing of the indictment" and that "it seems likely that the government was capable of obtaining the indictment . . . certainly sooner than the four years, three months, and two days that it took for the government to indict [her]," [Doc. 28 at 5], she "fails to identify facts that would tend to prove that the government acted in bad faith or made a deliberate decision to gain a tactical advantage over [her] that led to the delay," <u>Ramirez</u>, 491 F. App'x at 70.  In sum, Rosso's "claim of any [g]overnment intent to obtain a tactical advantage is speculation," <u>id.</u> (internal marks omitted), and it is therefore **RECOMMENDED** that Rosso's motion to dismiss the indictment due to inexcusable pre-indictment delay, [Doc. 28], be **DENIED**.

---

Office on August 26, 2010)], and Rosso's counsel has therefore had ample time to investigate and prepare for trial.

**B.**   **Motion to Dismiss the Indictment, or Alternatively, Motion to Strike Surplusage, or Alternatively, to Preclude the Jury from having Access to the Indictment and/or having it Read to Them, [Doc. 29]**

Rosso challenges certain paragraphs of the indictment as unnecessary to the allegations of the offense, and she argues that the indictment should be dismissed in its entirety, or alternatively, that these paragraphs should be stricken as surplusage, because they are "tantamount to an opening statement" and are "clearly prejudicial," [Doc. 29 at 6, 13], and because the indictment "is clearly what one would call a 'speaking indictment,'" containing "information and allegations that need not be included," [Doc. 45 at 2].[22]   Specifically, Rosso seeks to strike the paragraphs 1 through 9 and 11 through 19 in Count One of the indictment, which describe the CSA, various controlled substances, the defendants, the nature and purpose of the alleged conspiracy, and the manner and means of the alleged conspiracy, on the grounds that the language in these paragraphs "constitutes surplusage because said language is not relevant to explaining the essential facts constituting any of the [] charged offenses."   [Id. at 12].   Rosso contends that paragraph 10 "standing alone . . . satisfie[s] the requirement of what needs to be in

---

[22] As an alternative to dismissing the indictment or striking the paragraphs at issue, Rosso requests that the indictment not be read or presented to the jury, but her request is more properly reserved for the District Judge at trial.   See [Doc. 29 at 14; Doc. 45 at 3].

[the] Indictment when charging a violation of [21 U.S.C. § 846]." [Id. at 11].[23]
Likewise, Rosso argues that paragraphs 20 and 22 should be stricken since they
incorporate paragraphs 1 through 8, and that paragraph 24 should also be deleted
since it incorporates paragraphs 1 through 9 of the indictment. [Id. at 11-12]. In
response, the government contends that Rosso has failed to state a sufficient basis
for dismissal of the indictment, which meets the pleading requirements as a matter
of law, and that Rosso "has not met the exacting burden necessary to strike any
language from the [i]ndictment, much less to dismiss the [i]ndictment as a whole."
[Doc. 40 at 12-13].

Rule 7(c) of the Federal Rules of Criminal Procedure provides that an
"indictment . . . must be a plain, concise, and definite written statement of the
essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c). In addition,
the indictment "need not contain a formal introduction or conclusion," may
"incorporate by reference an allegation made in another count," and "may allege
that . . . the defendant committed [the offense] by one or more specified means. Id.
Rule 7(d) grants the Court the authority to strike language from an indictment or
information that is surplusage upon a motion by the defendant. Fed. R. Crim. P.

_____

[23] In this respect, Rosso maintains that because she has been charged with a
drug conspiracy under 21 U.S.C. § 846, proof of an overt act is not required, and
therefore, the information contained in paragraphs 1 through 9 and 11 through 19
of Count One of the indictment is surplusage. [Doc. 29 at 5-6].

7(d).  "A motion to strike surplusage from an indictment should not be granted 'unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. . . .  [T]his is a most exacting standard.'"  <u>United States v. Awan</u>, 966 F.2d 1415, 1426 (11th Cir. 1992) (citations and internal marks omitted).  However, "[t]he inclusion of clearly unnecessary language in an indictment that could serve only to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts involved surely can be prejudicial."  <u>United States v. Bullock</u>, 451 F.2d 884, 888 (5th Cir. 1971).  Nevertheless, the Court "will not strike allegations that are *relevant*, no matter how prejudicial or inflammatory they may be to the defendant[.]"  <u>United States v. Slawson</u>, Criminal Case No. 1:14–CR–00186–RWS–JFK, 2014 WL 5804191, at *17 (N.D. Ga. Nov. 7, 2014), adopted by 2014 WL 6990307, at *1 (N.D. Ga. Dec. 10, 2014) (citation and internal marks omitted).  "And, in order to determine whether the allegations are relevant to the charges and the evidence introduced at trial, [t]he Court may reserve ruling on a motion to strike surplusage until hearing the evidence and determining its relevance at trial."  <u>Id.</u> (citation and internal marks omitted).

As noted earlier, Count One charges Rosso and Hightower, who are not medical practitioners, with conspiring to dispense controlled substances, in violation of 21 U.S.C. § 846.  [Doc. 1 ¶¶ 1-19].  Count One includes several parts entitled,

"Introduction," "Defendants," "The Agreement," "Nature and Purpose of the Conspiracy," and "Manner and Means of the Conspiracy." [Id.].   The "Introduction" section includes information related to the CSA, the schedules of controlled substances, a description of the controlled substances allegedly distributed, and the authorization for licensed medical practitioners to dispense controlled substances.  [Id. ¶¶ 1-7].  The next section is entitled, "Defendants," which simply provides identification information regarding those charged in the indictment, [id. ¶¶ 8-9], and "The Agreement" section sets forth the alleged conspiracy, [id. ¶ 10].  Under the sections entitled, "Nature and Purpose of the Conspiracy" and "Manner and Means of the Conspiracy," the indictment explains that Rosso, who was not a  licensed medical practitioner, operated the Pain Center for the purpose of distributing controlled substances and conspired with Hightower, who was also not a licensed medical practitioner, to illegally distribute the controlled substances in order to generate large cash proceeds.  [Id. ¶¶ 11-19].  Count Two charges Rosso with maintaining the Pain Center to illegally dispense controlled substances, [id. ¶¶ 20-21], and Counts Three through Eighty-Six allege the illegal distribution of controlled substances on various dates between August, 2009, and September, 2010, in violation of 21 U.S.C. § 841, [id. ¶¶ 22-25].  These

counts incorporate the previous paragraphs entitled, "Introduction" and "Defendants." [Id. ¶¶ 20, 22, 24].

As the government points out, Rosso is not actually challenging the sufficiency of the indictment, but rather, she "argues that the government has alleged more (indeed, a 'surplusage') than what is absolutely necessary to charge the offenses." See [Doc. 40 at 12 (citation omitted)]; see also [Doc. 29]. "However, the fact that the indictment may contain a surplus of information, not required under Rule 7(c), does not provide grounds for dismissal." United States v. Webman, Criminal Action No. 1:13–CR–0025–SCJ, 2014 WL 835988, at *3 (N.D. Ga. Mar. 4, 2014), adopted at *1. Instead, "a motion to strike the surplusage, rather than dismissal of the entire count, is the appropriate remedy." Id. (footnote, citations, and internal marks omitted). Thus, Rosso's motion to dismiss the indictment in its entirety is due to be denied, and the Court will address her motion to strike surplusage. See id. at *3-4.

In addressing Rosso's arguments, the Court finds the decision in Webman, 2014 WL 835988, at *4-7, to be directly on point. In Webman, the defendants moved to dismiss a 21 U.S.C. § 846 drug conspiracy indictment, or in the alternative, to strike certain paragraphs similar to the ones at issue here. Id., at *1-2. Just as in this case, the defendants did not challenge the sufficiency of the indictment, but argued

that it actually contained more information than necessary.  Id., at *3.  The court

found that the allegations contained within the challenged paragraphs went directly

to the elements of the charged offense, and that while 21 U.S.C. § 846 "does not

require proof of an overt act and . . . the [g]overnment is not required to allege in the

indictment any conduct by Defendants[,] . . . [t]he fact that the [g]overnment is not

required to include the challenged language, arguably indicating it is surplusage,

does not carry Defendants' burden of establishing that the averments are not

relevant to the facts the [g]overnment may prove at trial or, if that burden is met,

establishing that the averments are inflammatory or prejudicial."  Id., at *4-5

(citation omitted).  In particular, the Webman court noted that the challenged

paragraphs "set forth how the [g]overnment contends Defendants allegedly

operated the pain clinic and the reasons the [g]overnment contends Defendants . .

. conspired with [another] Defendant . . . in the operation of [the] pain clinic in order

to illegally dispense large amounts of controlled substances[.]" Id., at *5.  The court

then found that "the conduct alleged in the indictment [was] relevant to the

determination of whether Defendants conspired to unlawfully dispense controlled

substances," and that it was well-settled that "allegations in support of a charged

conspiracy offense do not have to set forth illegal activity nor, for that matter, be

restricted to stating elements of the offense, in order to be relevant and material."

Id. (citation omitted).  The court also rejected the defendant's conclusory challenges to the "Introduction" and "Defendants" sections of the indictment, finding that they had not established that the allegations were "irrelevant to the charges and, additionally, [were] unfairly prejudicial and inflammatory."  Id., at *6 (footnote omitted).

Similarly, the Court finds that the allegations Rosso seeks to strike are relevant to the charged offenses in the indictment.  Indeed, "[i]t is clear that the language which [Rosso] seeks to strike sets out for the jury the way in which the government contends that this conspiracy was to operate and what goals the conspiracy sought to accomplish," and the "listed overt acts, while not required to be proved for a conviction under § 846, nevertheless set out factual allegations regarding the way in which the conspiracy actually worked."  Id. (internal marks omitted) (quoting United States v. Alexander, Crim. No. 06–60074–01, 2008 WL 2130185, at *3 (W.D. La. May 18, 2008)).  "Clearly, the government is entitled to prove, if it can, each and every one of these overt acts" and "what it believes to be the objectives of the conspiracy, and the ways in which the individual defendants attempted to accomplish the objectives of the conspiracy."  Id. (internal marks omitted) (quoting Alexander, 2008 WL 2130185, at *3).  Here, "[w]hat this indictment does is to inform the defendants of what the government intends to prove," id. (citation and internal

marks omitted), and "[i]f the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." <u>United States v. Kelley</u>, Criminal No. 08–00327–CG, 2009 WL 2176347, at *2 (S.D. Ala. July 17, 2009) (citation and internal marks omitted).

Rosso has simply not met the "exacting standard" of showing that "the allegations are not relevant to the charge and are inflammatory and prejudicial." <u>Awan</u>, 966 F.2d at 1426.  Thus, the Court concludes that the paragraphs at issue contain allegations that "may be relevant and material to the charged offenses," and since Rosso "must prove both that the challenged allegations are not relevant as well as being inflammatory and prejudicial," it is hereby **RECOMMENDED** that Rosso's motion, [Doc. 29], be **DENIED**, and that "any reconsideration of the motion occur after introduction of the [g]overnment's evidence at trial." <u>Webman</u>, 2014 WL 835988, at *7 (citations omitted).

## C.   <u>Motion to Suppress Evidence obtained from the Search of Rosso's Purse, [Doc. 30]</u>

Rosso moves to suppress all evidence obtained as a result of the search of her purse that occurred during the execution of the search warrant at the Pain Center on May 10, 2010.  [Doc. 30].  Rosso argues that the search of her purse exceeded the scope of the search warrant, and that "[t]here was no basis for law enforcement to

conclude that any evidence sought pursuant to the search warrant for the business would be located in [her] purse." [Id. at 4-5]. Rosso also maintains that law enforcement only searched her purse after she made certain statements, including that the purse belonged to her, which should not be considered in determining whether the search exceeded the scope of the warrant. [Id. at 3 n.1, 5]. As a consequence, Rosso contends that any evidence seized from her purse should be suppressed. [Id. at 6].[24]

"'When an official search is properly authorized– whether by consent or by the issuance of a valid warrant– the scope of the search is limited by the terms of its authorization.'" United States v. Rhoades, Criminal File No. 1:08-CR-56-TWT, 2008 WL 3925168, at *8 (N.D. Ga. Aug. 26, 2008), adopted at *1 (citation omitted) (quoting Walter v. United States, 447 U.S. 649, 657 (1980)). It is well-established that the Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging of a person's belongings. Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971); see also Marron v. United States, 275 U.S. 192, 196 (1927). "To prevent such rummaging, therefore, a warrant must enable the executing officer to ascertain and identify with

---

[24] Rosso does not otherwise contend that the affidavit in support of the search warrant for the Pain Center failed to establish probable cause. See generally [Docs. 30 & 67].

reasonable certainty those items that the magistrate has authorized him to seize." Rhoades, 2008 WL 3925168, at *8 (citations and internal marks omitted). "In some cases, however, it is not immediately apparent whether or not an object is within the scope of the search warrant; and, in such cases, an officer must examine the object simply to determine whether or not it is one that he is authorized to seize." Id. (internal marks omitted) (quoting United States v. Slocum, 708 F.2d 587, 604 (11th Cir. 1983)). "The scope of the search generally includes any area where the item in question may be found, even if the search requires separate acts of entry or opening." United States v. Edwards, 343 F. App'x 468, 471 (11th Cir. 2009) (per curiam) (unpublished) (citation and internal marks omitted).

The May 7, 2010, search warrant explicitly authorized the search of the Pain Center to seize, *inter alia*, "prescription pads with Dr. [] Mansour's name; forged or fraudulent prescription pads; forged documents with Dr. [] Mansour's name, . . . pharmaceuticals, financial transaction papers, documents, currency, ledgers, address books, phone listings, notes of monies owed and earned, . . . objects related to narcotic activity[,] . . . [a]ny papers or records related to controlled substances such as books, prescription pads, prescription papers, receipts, ledgers, . . . and . . . credit card statements. [Doc. 30-1 at 7]. The purse at issue was properly searched pursuant to this warrant. Indeed, even accepting Rosso's assertion that the Court

should not consider her statements regarding the ownership of the purse in determining whether the search of her purse exceeded the scope of the warrant, see [Doc. 30 at 3 n.1], law enforcement officers were authorized to search the premises for evidence of violations of O.C.G.A. §§ 16-13-41 and 16-9-1, namely, prescription pads, currency, controlled substances, and financial documents, [Doc. 30-1 at 7].  As the parties agree, see [Doc. 30 at 4; Doc. 40 at 15], "in determining whether a search of personal effects violates the scope of a 'premises' warrant, one must consider the relationship between the object, the person and the place being searched," United States v. Young, 909 F.2d 442, 444-45 (11th Cir. 1990) (citation omitted).  In fact, the Eleventh Circuit, relying on a decision from the First Circuit, noted that "the usual occupant of a building being searched would lose a privacy interest in [her] belongings located there," and that the First Circuit therefore concluded that a "briefcase belonging to an employee could be searched pursuant to a premises warrant, whether found in his possession or under his desk."  Id. at 445 (citing United States v. Micheli, 487 F.2d 429, 431-32 (1st Cir. 1973)).  That is, "unlike the nearly absolute protection of a residence, the great variety of work environments requires analysis of reasonable expectations on a case-by-case basis," and "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home."  United States v. McCullough,

Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *5 (N.D.

Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014)

(second alteration in original) (citations and internal marks omitted).

Rosso asserts that the agents observed the purse on an office desk, see [Doc.

30 at 3 ¶ 3], and as part of searching the premises pursuant to the valid warrant, they

searched this purse.  At the time of the search, agents were aware that Rosso was the

office manager of the Pain Center and it was entirely reasonable for the agents to

believe that the purse located on an office desk could easily contain items authorized

for seizure under the search warrant, including prescription pads, prescriptions, and

currency, to name a few.  See United States v. Votrobek, Criminal Action File No.

4:11–CR–022–RLV–WEJ, 2012 WL 6929277, at *8 (N.D. Ga. June 25, 2012), adopted

by 2013 WL 298037, at *1 (N.D. Ga. Jan. 23, 2013) (upholding a search of defendant's

attaché bag during an execution of a search warrant at a business as within the scope

of the warrant authorizing seizure of controlled substances, documents, and

receipts, among other things, noting that defendant "likely carried some of the above

items in his attaché bag to and from his office at AMG (although [the agent] did not

know whose bag or office he was searching at the time")).  In fact, "[a] woman's

purse, not in her possession, may be considered a [] container, falling within the

scope of a search warrant," and "where the defendant's purse was . . . not in her

possession, it was merely another [] item subject to the lawful execution of the search warrant which the federal agents held and were enforcing." United States v. Morrison, No. 4:07 CR 582 RWS DDN, 2008 WL 474327, at *7 (E.D. Mo. Feb. 15, 2008), adopted by 2008 WL 782618, at *1 (E.D. Mo. Mar. 21, 2008) (citations and internal marks omitted).

Accepting Rosso's contention that without her statements, "law enforcement would not have known that the purse belonged to [her] prior to seizing and searching it, thereby making the connection between the purse and the business even more tenuous," [Doc. 30 at 5], "without notice of some sort of ownership of a belonging, the police are entitled to assume that all objects within premises lawfully subject to search under a warrant are part of those premises for the purpose of executing the warrant," United States v. Gray, 635 F. Supp. 572, 575 (D. Me. 1986) (citations and internal marks omitted). One court analyzed the situation by hypothetically assuming the search of a restaurant pursuant to a search warrant, whereby a customer's raincoat was searched, and noted that "[i]f the warrant was issued because the restaurant was suspected to be a betting parlor, a reasonable expectation of the warrant might include a search of customer[s'] raincoats (assuming the coats to be deposited on the premises, and not still on the backs of the customers)." Id. at 577 (first and last alterations in original) (citation and internal

marks omitted).  The court noted that it "would be unrealistic in these circumstances to expect the officers to treat the deposited jacket as anything other than a plausible repository for the currency and records for which they held a valid warrant to search the premises."  Id.  Similarly, it would be unreasonable here to expect the agents to treat the purse located on an office desk as anything other than a plausible repository for the type of evidence they were authorized to seize under the warrant.  See United States v. Newman, 685 F.2d 90, 92 (3d Cir. 1982) (citation and internal marks omitted) (reversing district court's decision suppressing evidence seized by officers from a closed briefcase located on a credenza during a search of defendant's office pursuant to a warrant, finding that suppressing the evidence was "contrary to the basic principle that a warrant-authorized search of a place may encompass any containers in which objects named in the warrant might be found").  Accordingly, the Court finds that the search of Rosso's purse did not exceed the scope of the search warrant, and it is **RECOMMENDED** that Rosso's motion to suppress evidence seized from her purse, [Doc. 30], be **DENIED**.

**D.**   **Motion to Suppress Evidence obtained from the Search of Rosso's Residence, [Doc. 31]**

Rosso argues that the May 12, 2010, search warrant for her residence was invalid because the affidavit upon which it was obtained lacked "sufficient probable cause to conclude that the property sought to be seized would be located in [her]

residence during the execution of the search warrant," [Doc. 31 at 8], and she asserts

that the good faith exception is inapplicable, [id. at 10-11].  The Court will address

each of these arguments in turn.

**1.**     *Probable Cause*

The Eleventh Circuit has explained the Court's review of the sufficiency of a

search warrant as follows:

> When called upon by law enforcement officials to determine the
> legitimacy of search warrants and their supporting affidavits, issuing
> magistrates and reviewing courts alike must strike a delicate balance
> between constitutional guarantees against excessive intrusions into
> areas of individual freedom and the Government's need to access and
> to secure relevant evidence in criminal prosecutions.  In particular,
> issuing magistrates are given the unenviable task of making "firing
> line" decisions that attempt to encourage availment of the warrant
> process while simultaneously striving to protect citizens from
> unwarranted governmental interference.   In recognition of the
> difficulty inherent in discharging this responsibility, reviewing courts
> lend substantial deference to an issuing magistrate's probable cause
> determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "The Fourth Amendment

requires that a search warrant be issued only when there is probable cause to believe

that an offense has been committed and that evidence exists at the place for which

the warrant is requested."   United States v. Betancourt, 734 F.2d 750, 754 (11th Cir.

1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United

States   v.   Cadet,   Criminal   Action   Nos.   1:11–CR–00522–WBH–LTW,

1:11–CR–00113–WBH–LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted

by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), *aff'd* by, 574 F. App'x 917 (11th Cir.

2014) (per curiam) (unpublished).  That is, "[p]robable cause to search a residence

requires some nexus between the premises and the alleged crime."  United States v.

Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted).

"[P]robable cause deals 'with probabilities [which are] . . . the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal

technicians, act.'"  Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v.

United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No.

15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015).

"Courts reviewing the legitimacy of search warrants should not interpret

supporting affidavits in a hypertechnical manner."  Miller, 24 F.3d at 1361 (citation

omitted).  Instead, "a realistic and commonsense approach should be employed so

as to encourage recourse to the warrant process and to promote the high level of

deference traditionally given to magistrates in their probable cause determinations."

Id. (citations omitted); see also McCullough, 2012 WL 11799871, at *13.  Furthermore,

"the fact than an innocent explanation may be consistent with the facts alleged . . .

does not negate probable cause."  United States v. Fama, 758 F.2d 834, 838 (2d Cir.

1985) (citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).

Contrary to Rosso's contention, Agent DeJesus' affidavit alleged sufficient facts to establish probable cause to believe that evidence involving the illegal distribution of controlled substances would be found in her residence. Agent DeJesus recited that fraudulent prescriptions dated between March, 2009, and March, 2010, bearing Dr. Mansour's name on Dr. Gatell's prescription pads had been obtained during the investigation despite the fact that Dr. Gatell was on probation and Dr. Mansour denied authorizing any prescriptions at the Pain Center after February 27, 2009; that Agent Cleary visited the Pain Center on February 1 and March 22, 2010, and while no doctor was present, Rosso was present on both dates, as were patients; that a police report had been filed in May, 2009, suggesting that Rosso and Dr. Gatell had been passing out controlled substances without the presence of an authorized doctor; that a patient confirmed that the Pain Center was still seeing patients and giving out prescriptions and that she had received prescriptions every two months from "Maggie"; that a search executed at the Pain Center revealed that checkbooks with a joint account number under Dr. Gatell and Rosso's names were found during the business search and inside Rosso's purse; that Rosso made certain statements, including that she was in charge of all of the finances

47

for the Pain Center and that she took care of Dr. Gatell's personal finances and gave him several thousands a week; and that a sign in the office stated, "We can only accept cash at this time.  No checks No credit cards."  [Doc. 31-1 at 2-4].  Based on these facts, Agent DeJesus averred that he believed Rosso "knew that the prescriptions for narcotics were being illegally distributed from [Dr. Gatell's] office," that "further evidence of assets obtained through criminal means may be present at [Rosso's] residence," and that he believed there would be "proceeds from the [Pain Center] at [Rosso's] residence[.]"  [Id. at 4].

Rosso argues that the Court should not consider the facts related to the finding of checkbooks in her purse or her statements made during the May 10, 2010, search of the Pain Center, including that she was in charge of all the finances for the office and responsible for the collection of cash received for services rendered and that she took care of Dr. Gatell's personal finances and gave him several thousands a week, in determining whether the search warrant affidavit established probable cause to believe that evidence of a crime would be located at her residence.  [Doc. 46 at 2].  In support of this argument, Rosso again maintains that the search of her purse on May 10, 2010, exceeded the scope of the warrant for the Pain Center, see [id.]; however, having already concluded that the search of her purse was within the scope of the warrant, the Court rejects Rosso's request for that evidence not to be

considered.   Rosso also maintains that any statements she made during the

execution of the search warrant at the Pain Center on May 10, 2010, were obtained

in violation of her constitutional rights and therefore should not be considered.  [Id.].

The government has agreed to not use these statements in its case-in-chief at trial,

and the Court will not consider any statements made by Rosso after invoking her

right counsel on May 10 in reaching the probable cause determination.[25]  See United

States v. Castro-Rivas, No. 2:05-CR-00231 TC, 2005 WL 2596460, at *7 (D. Utah Oct.

---

[25] The record regarding statements Rosso made during the execution of the search warrant on May 10 was not developed at the evidentiary hearing after Rosso's counsel announced that she was no longer moving to suppress those statements since the government was not going to use them at trial.  (Tr. at 4, 43). Thus, it is unclear when Rosso was advised of her rights on May 10 and whether she made any statements prior to being advised of her rights or prior to invoking her right to counsel.  "*Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement," United States v. Jackson, 506 F.3d 1358, 1361 (11th Cir. 2007) (citing United States v. Patane, 542 U.S. 630 (2004)), and several courts have held that voluntary, but unwarned statements may be used "to help establish probable cause in a search warrant affidavit," United States v. Redrick, 48 F. Supp. 3d 91, 107 n.11 (D.D.C. 2014) (citing United States v. Phillips, 468 F.3d 1264 (10th Cir. 2006), cert. denied, 549 U.S. 1312 (2007)); see also United States v. Knill, Criminal No. 1:07-CR-0029, 2007 WL 1892560, at *5 n.17 (M.D. Pa. June 29, 2007) ("Using statements to obtain a search warrant does not compel defendant to testify against himself at trial and, therefore, does not require the suppression of the evidence found pursuant to the warrant.").  Thus, if prior to invoking her right to counsel, Rosso were found to have voluntarily made any statements included in the affidavit for the search warrant, despite any alleged *Miranda* violation, those statements could properly be considered, but since the record has not been developed on this point, the Court will not consider any statements attributed to Rosso from May 10 included in the affidavit in determining whether the search warrant for her residence was supported by probable cause.

13, 2005), *aff'd*, 254 F. App'x 742 (10th Cir. 2007), <u>abrogated on other grounds by</u>
<u>United States v. Sanchez-Leon</u>, No. 13–1401, 2014 WL 4178302 (10th Cir. Aug. 25,
2014) (purging from consideration statements included in affidavit that defendant
made after invoking his right to counsel and finding that remaining facts in affidavit
established probable cause for the search warrant).

Even without Rosso's statements, the remaining facts in the affidavit support
finding probable cause to search Rosso's residence. Indeed, the affidavit sets forth
information gathered as part of an ongoing investigation, including that a patient
had informed the agents that she had been receiving her prescriptions from
"Maggie" every two months, that checkbooks for a joint account in both Dr. Gatell
and Rosso's name were found during the business search and inside Rosso's purse,
and that the Pain Center only operated on a strictly cash basis, and that based on his
experience, Agent DeJesus believed proceeds from the Pain Center and further
evidence of assets obtained through criminal means would be located at Rosso's
residence. The Eleventh Circuit has held that a "police officer's expectation, based
on prior experience and the specific circumstances of the alleged crime, that
evidence is likely to be found in a suspect's residence satisfies probable cause."
<u>United States v. Bradley</u>, 644 F.3d 1213, 1263-64 (11th Cir. 2011) (per curiam)
(unpublished) (citation omitted). In fact, "[t]he affidavit need not allege that any

illegal activity occurred at the residence, but should provide a reasonable basis to conclude that the defendant might keep evidence of [her] crimes at home," United States v. Aguilar, 519 F. App'x 541, 545 (11th Cir. 2013) (citation and internal marks omitted), which is exactly what Agent DeJesus' affidavit established.  In short, the affidavit included sufficient information to establish probable cause to believe that evidence of Rosso's alleged crimes would be located in her residence.  Therefore, Rosso's contention that Agent DeJesus' affidavit did not establish probable cause is without merit.

### 2. *Good Faith Exception*

Even if the search warrant in this case were found to be invalid, suppression of the evidence seized from the residence would not be warranted because the officers executing the warrant reasonably relied in good faith on the validity of the warrant.  See United States v. Leon, 468 U.S. 897 (1984).  Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate." United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and

internal marks omitted); <u>see also</u> <u>United States v. Robinson</u>, 336 F.3d 1293, 1295-96

(11th Cir. 2003).

There are four exceptions to the <u>Leon</u> good-faith exception doctrine, none of

which apply here:

> (1) where the magistrate or judge in issuing a warrant was misled by
> information in an affidavit that the affiant knew was false or would have
> known was false except for his reckless disregard of the truth; (2) where the
> issuing magistrate wholly abandoned his judicial role in the manner
> condemned in <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 99 S.Ct. 2319, 60
> L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so
> lacking in indicia of probable cause as to render official belief in its existence
> entirely unreasonable; and (4) where, depending upon the circumstances of
> the particular case, a warrant is so facially deficient-i.e., in failing to
> particularize the place to be searched or the things to be seized-that the
> executing officers cannot reasonably presume it to be valid.

<u>United States v. Martin</u>, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal

marks omitted). Though Rosso argues that the affidavit "contained information that

was obtained illegally by law enforcement and is so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable," [Doc. 46 at

3 (citations and internal marks omitted)], as discussed *supra*, these arguments are

without merit. In addition, Rosso does not argue, and there is nothing in the record

to suggest, that the judge who reviewed the affidavit and signed the search warrant

engaged in any misconduct or abrogation of judicial responsibility. As discussed

*supra*, the affidavit set forth sufficient probable cause, and in any case is not "so

lacking . . . as to render official belief in its existence entirely unreasonable." <u>Martin</u>,

297 F.3d at 1313.

Finally, the warrant is facially valid in that it describes in sufficient detail the

things to be seized, the location for the search, and it is signed by a judge.  Officers

executing the warrant would therefore have been justified in believing in its validity,

and evidence seized during the execution would not be subject to suppression.

<u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 981-82 (1984).   Accordingly, it is

**RECOMMENDED** that Rosso's motion to suppress evidence arising from the search

of the residence, [Doc. 31], be **DENIED**.

**E.**     <u>**Motion to Suppress Statements, [Doc. 32]**</u>

Rosso alleges that the statements she made during the May 21, 2010, interview

were taken in violation of her Sixth Amendment right to counsel, and that any

"topics outside of her limited waiver of counsel are inadmissible as evidence." [Doc.

80 at 12-13].[26]   In particular, Rosso asserts that "[r]ather than appreciate [her]

---

[26] Rosso initially argued that her statements were not voluntarily made and
were not the product of an intelligent, knowing, and valid waiver of her <u>Miranda</u>
rights, <u>see</u> [Doc. 32]; however, it appears that she has abandoned these arguments
as her post-hearing brief focuses exclusively on a violation of her Sixth Amendment
right to counsel, <u>see</u> [Doc. 80]; <u>see also</u> <u>United States v. Hicks</u>, 546 F. Supp. 2d 1378,
1380 n.2 (N.D. Ga. 2008), adopted at 1379 (defendant abandoned preliminary
challenges to arrest and searches where, in his perfected motion, he sought only to
suppress post-arrest statements and fruits of alleged unconstitutional activity);
<u>United States v. Smith</u> , No. 1:07-cr-54-WSD, 2008 WL 746546, at *7 (N.D. Ga. Mar.
18, 2008), adopted at *4 (noting that defendant had abandoned motion to suppress

willingness to waiver her right to counsel for [the] limited purpose [of advising law

enforcement of the potential danger to the community posed by Dr. Gatell] and

abide by [her] stated limitation, law enforcement instead used this opportunity to

engage in a full-ranging interview of [her] that lasted for nearly two hours and

covered topics well beyond those initially anticipated by [her] or presumably her

counsel[, who was on vacation]."   [Id. at 12].  She contends that to "permit law

enforcement to circumvent [her] constitutional rights by taking advantage of the

absence of her attorney to question her on topics about which she specifically

advised she did not want to discuss flies in the face of the Sixth Amendment's right

to counsel and renders any protections afforded under this Amendment hollow."

[Id.].  In response, the government contends that no federal Sixth Amendment right

had attached at the time of the May 21 interview, and that even if it had, Rosso

waived her right to counsel on all but two specific topics which she refused to

answer, and that the "record establishes that Rosso volunteered information about

---

statements where he made no argument with respect to it).  In any event, the record
supports finding that Rosso knowingly, intelligently, and voluntarily waived her
rights.   The video recording indicates that the tone of the interview was
conversational and Rosso appeared to understand the nature of the interview and
the consequences of her statements, and she provided responsive answers, declined
to answer questions she did not want to answer or felt were better left for her
attorney, and did not appear to be under the influence of alcohol or drugs. (Gov. Ex.
1).  The agents never made physical contact with Rosso and never threatened her or
made her any promises.  (Id.).

her own involvement in the conspiracy, strategically guided the direction of the interview, and was comfortable declining to answer questions without her attorney on multiple occasions, but never when asked about her own involvement," and that her statements, with the exception of when she requested an attorney, are admissible.  [Doc. 85 at 10].

Rosso contacted Agent Byrd on May 20, 2010, and advised him that she wished to speak with the agents about Dr. Gatell's ongoing activity, and that she was willing to waive her <u>Miranda</u> rights and speak with them even though her attorney was on vacation. <u>See</u> (Gov. Ex. 1; Tr. at 48-49, 106).  Agent Byrd advised her that he would not re-arrest her if she met with him and that she still retained her right to counsel and could refuse to answer any questions at any time, and they agreed to meet the following day.  (Tr. at 49-50; Gov. Ex. 1).  On May 21, Rosso appeared at the Fayette County Sheriff's Office on her own accord, and after Agent Byrd advised her of her <u>Miranda</u> rights, she agreed to waive her rights and proceeded to make statements on a variety of topics related to the investigation. <u>See</u> (Tr. at 39, 45, 50; Gov. Exs. 1 & 3; Def. Ex. 1); [Doc. 75-8].

"Under the Sixth Amendment, [i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for [her] defence." <u>United States v. Burgest</u>, 519 F.3d 1307, 1309 (11th Cir. 2008) (first and second alterations in

original) (citation and internal marks omitted).  "The Sixth Amendment prohibits the admission of statements deliberately elicited by the government from a defendant after adversary criminal proceedings have begun, unless the defendant's counsel is present or the defendant waives [her] right to counsel." United States v. Turner, Criminal Case No. 1:13–CR–276–ODE–GGB, 2015 WL 4042148, at *13 (N.D. Ga. June 30, 2015), adopted at *9-10 (citations omitted).  The "Sixth Amendment right is offense specific and applies only to offenses for which an accused has been charged, not to other offenses still under investigation." United States v. US Infrastructure, Inc., 576 F.3d 1195, 1216 (11th Cir. 2009) (citations and internal marks omitted).  That is, "where conduct violates laws of separate sovereigns, the offenses are distinct for purposes of the Sixth Amendment right to counsel." Burgest, 519 F.3d at 1310; see also United States v. Jackson, 292 F. App'x 770, 774 (11th Cir. 2008) (per curiam) (unpublished).  Thus, "a Sixth Amendment violation occurs when (1) government agents (2) deliberately elicit incriminating statements from an accused after [s]he has been indicted, outside the presence of counsel, and (3) in the absence of any waiver of [her] Sixth Amendment rights." United States v. Mansfield, Criminal Action File No. 4:14–CR–25–HLM, 2014 WL 6879054, at *6 (N.D. Ga. Dec. 4, 2014), adopted at *3 (citations omitted).  Rosso "has the burden of establishing a

violation of the Sixth Amendment right to counsel." Id. (citation and internal marks omitted).

Although the government maintains that Rosso's Sixth Amendment right to counsel had not yet attached at the time of the May 21, 2010, interview, even if it had, the Court finds that Rosso voluntarily, knowingly, and intelligently waived her rights and agreed to speak with the agents on a variety of topics related to the investigation. Indeed, "[a] defendant may waive [her] Sixth Amendment right to counsel so long as relinquishment of the right is voluntary, knowing, and intelligent." Turner, 2015 WL 4042148, at *13 (citation and internal marks omitted). "A defendant waives [her] Sixth Amendment right to counsel by initiating contact with law enforcement in order to speak with them." Id. (citation omitted). In addition, a defendant "may waive the right whether or not [s]he is already represented by counsel; the decision to waive need not itself be counseled." Mansfield, 2014 WL 6879054, at *6 (citations and internal marks omitted). "And when a defendant is read [her] *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the Fifth Amendment[.]" Id. (second and third alterations in original) (citation and internal marks omitted). "If there is no valid waiver, [t]he penalty for violation of

this Sixth Amendment right is suppression of the accused's incriminating statements." Id. (citation and internal marks omitted).

Rosso agrees that she waived her right to counsel prior to making certain statements to law enforcement agents on May 21, 2010. See generally [Doc. 80]. In fact, the record shows that Rosso signed a written waiver of her Miranda rights after Agent Byrd verbally advised her that she had the right to remain silent as well as the right to counsel and after she was given an opportunity to read the pre-printed Miranda form. See [Doc. 75-8 at 2-4, 12]; (Gov. Exs. 1 & 3). The form the agents provided adequately stated all of the rights required under Miranda, and clearly stated that the individual signing the form had been informed of those rights, fully understood them, and freely and voluntarily waived them. See (Gov. Exs. 1 & 3). The agents watched Rosso read the form before signing and initialing it in the proper areas, and she then answered the agents' questions, even objecting to certain questions she felt were better left for her attorney to answer. See generally (Gov. Ex. 1). Thus, the issue here concerns the scope of Rosso's waiver, which she maintains was limited solely to advising law enforcement "about what Dr. Gatell was doing at that time," and that any statements outside that narrow topic, including statements related to her activities within the Pain Center, are therefore inadmissible. [Doc. 80 at 11].

58

Rosso's initiation of contact with law enforcement, her signature on the waiver form, and the fact that she exercised free choice to refuse to answer certain questions show that she knowingly, intelligently, and voluntarily waived her rights and chose to answer certain questions and address specific topics during the interview. Rosso was properly informed of her Miranda rights prior to questioning, and waived those rights before making any statements. Although Rosso contends that the agents "repeatedly steered their questions to topics related to [her] activities within the Pain Clinic" and that they "ignored [her] statements regarding her attorney and continued their questioning of [her]," even "despite [her] requests to go home[,]" [Doc. 80 at 11], the video recording of the interview and transcript of the recording belie her assertions. That is, the video depicts that Rosso freely discussed her actions, her role in the Pain Center, and topics related to Drs. Gatell and Mansour, including that she broached the subject regarding the alleged illegal actions of four other pain management doctors, but that once Agent Byrd asked for those doctors' names, she refused to answer, stating that she wanted her attorney to help with that. See (Gov. Ex. 1); [Doc. 75-8 at 13-14]. Once she mentioned her attorney, the agents actually steered the conversation back to Dr. Gatell. See [Doc. 75-8 at 14]. Thereafter, Rosso again spoke freely with the agents, and the agents even reminded her at times that they were interested in what Dr. Gatell did. See [id.

at 33, 63, 65].  When Rosso mentioned that she needed to go home, the agents

advised her they were not going to keep her, but Rosso continued to speak with the

agents.  [Id. at 99-103].  Agent Byrd even advised Rosso that she was free to go and

when he asked her one last question about who signed the prescriptions at the Pain

Center, Rosso refused to answer, stating that she thought that was something her

attorney should answer, [id. at 103].  At that point, Agent Byrd attempted to

conclude the interview, but Rosso continued to speak, and he even interrupted her

and told her that she had said she wanted to go home and that he did not want to

keep her.  [Id. at 104-06].  Thus, despite Rosso's contentions, the video-recorded

interview shows that Rosso voluntarily, knowingly, and intelligently waived her

rights and freely discussed various topics, with the exception of two topics during

which she specifically invoked her right and refused to answer the questions,[27] and

---

[27] Although Rosso asserts that the agents ignored her statements regarding her attorney, see [Doc. 80 at 11], a review of the video recording shows that the agents did not continue those lines of questioning at issue once it was clear that Rosso did not wish to discuss those topics, and "[a] suspect's refusal to answer certain questions . . . is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and . . . questioning may continue until the suspect articulates in some manner that [s]he wishes the questioning to cease," United States v. Thomas, Criminal Action No. 4:13–CR–22–RLV, 2014 WL 793359, at *8 (N.D. Ga. Feb. 25, 2014), adopted at *1 (third alteration in original) (citation and internal marks omitted); see also United States v. May, Criminal No. 14–136 (JRT/LIB), 2014 WL 6775283, at *10 (D. Minn. Dec. 2, 2014), adopted at *1 (finding officers did not violate defendant's right to counsel by continuing to question him where he indicated that he would not "talk about 'that part' without a lawyer" since that was not an "objectively unequivocal statement that he wanted all questioning

the Court finds that her statements made during the May 21, 2010, interview are therefore admissible and not due to be suppressed as violative of her constitutional rights. Accordingly, it is **RECOMMENDED** that Rosso's motion to suppress statements, [Doc. 32], be **DENIED**.

## III. CONCLUSION

For the foregoing reasons and cited authority, the government's motion for leave to file a sur-reply, [Doc. 74], is **GRANTED**, and it is **RECOMMENDED** that Rosso's pending motions to dismiss and to suppress, [Docs. 28, 29, 30, 31, & 32], be **DENIED**, and that Hightower's pretrial motions, [Docs. 25, 27, 34, 70], and the parties' consent motion associated with Hightower's motions, see [Doc. 84], be **DENIED AS MOOT**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 3rd day of September, 2015.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

to cease until he had a lawyer present").